**STATE of Missouri, Respondent,**

v.

**Alberto M. REYES, Appellant.**

**No. WD 61400.**

Missouri Court of Appeals, Western District.

June 24, 2003.

Emmett D. Queener, Assistant State Public Defender, Columbia, MO, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Assistant Attorney General, Jefferson City, MO, for respondent.

Before LOWENSTEIN, P.J., and SMART and EDWIN H. SMITH, JJ.

HAROLD L. LOWENSTEIN, Presiding Judge.

Alberto M. Reyes was convicted by a jury of murder in the second degree, Section 565.021,[1] and armed criminal action, Section 571.015. He was sentenced to concurrent terms of life imprisonment for each. On appeal, Reyes alleges that the trial court abused its discretion in permitting the State to argue its case in *voir dire*. He also argues that the trial court abused its discretion in permitting the prosecutor to denigrate defense counsel during closing argument. The judgment is affirmed.

### Statement of Facts

On July 17, 1998, a little before five o'clock in the evening, Marco Duarte arrived at the Jazz Louisiana Kitchen restaurant located in Kansas City to begin his shift. Duarte clocked in, said hello to the day shift bartender, Lynn Marie Thompson, and went into the food prep area of the kitchen to begin work. At this time, Thompson was cutting fruit for the evening shift. Her two children were with her waiting to be picked up by their father. Shortly after seeing Duarte go into the food prep area, she heard a crash and heard Cecelia, another prep cook, scream. Fearing that Cecelia had fallen, Thompson ran back into the food prep area. Cecelia was running from the food prep area crying and screaming. As Thompson reached the doorway to the food prep area, she saw the appellant, Alberto Reyes, a day shift dishwasher, with a knife in his hand swinging it at Duarte. Duarte was holding a metal tray in front of him, trying to keep Reyes away. She yelled Reyes' name and he turned to look at her. Thompson saw her children coming toward her, grabbed them, and went out into the restaurant.

About the time Duarte arrived at the restaurant, Xavier Martinez,[2] a cook, had also arrived for his shift. He was beginning to work, when he, too, heard pans falling and Cecelia scream. He saw Cecelia run, screaming hysterically, from the food prep area. He then entered the area and saw Duarte on the floor and Reyes standing over him, "knifing him" with a large butcher knife. He also saw Duarte holding a metal tray in front of him. He heard Duarte say, "Leave me alone. Leave me alone." Martinez tried to separate Reyes and Duarte, but Reyes came after Martinez with the knife. He then left to get help. Victor Duarte, a relative of Duarte and an employee of the restaurant,[3] was coming to work. Victor and Martinez then went back into the food prep area. Martinez testified he saw Reyes still standing over Duarte. Reyes

---

1. All statutory references are to the Revised Statutes of Missouri 2000, unless otherwise indicated.

2. Martinez's wife was related to Duarte.

3. Several of Duarte's relatives worked at Jazz Louisiana Kitchen at the time. The relatives returned to Mexico for Duarte's burial and some did not return to the United States.

came after them with the knife again. They left the area again and Victor told Martinez to get the police. Martinez went outside looking for the police. As he was going around the block, Martinez observed Reyes leave through the service door, get into his car, and drive away.

Ricky Essex, the head chef, had finished his shift around this time and was downstairs in the office changing his clothes. He heard a lot of noise, Spanish being spoken louder than normal, and thought there was a fight. He went upstairs and saw Victor "dancing around talking in Spanish." When he got to the middle of the kitchen, he saw Reyes walking from the food prep area carrying a knife. He placed his hand on Reyes' shoulder and asked him what was going on. Reyes pulled the knife on Essex, and Essex backed away. Reyes then walked out of the back door and to his van, which was parked just to the right of the door. This was unusual because employees were supposed to park on the furthest side of the parking lot, away from the building. Reyes, acting as if nothing were wrong, got into the van and drove away. When Essex went back into the food prep area, Duarte was lying on the floor gasping for breath. Essex could see multiple stab wounds. A doctor from KU Medical Center, which was across the street from the restaurant, was in the restaurant and began providing medical assistance.

Two waitresses, one who was already waiting tables and one who had arrived a little late for her shift, saw Reyes drop a knife into a trash can as he walked toward the back door. Mike Vandee, the restaurant manager, also saw Reyes going out of the back door with blood on him. Since they had just received new knives, which were very sharp, he thought Reyes had cut himself. He tried to stop him, but Reyes did not respond. As Vandee was calling 911, Reyes then got into his van and drove away. Vandee thought he was possibly driving himself to KU Medical Center next door.

Officer Tim Hernandez, a Kansas City, Missouri, police officer, was the first to respond. Upon hearing a commotion, he proceeded to the rear of the restaurant. He observed Duarte lying on his back on the floor covered in blood. He then cleared everyone from the scene except for the KU Medical Center doctor that was in the restaurant. While securing the scene, he observed a butcher knife with what appeared to be blood on it in the trashcan near the door to the parking lot.

Crime scene technician Charles Johnson arrived and observed a large pool of apparent blood on the floor and blood splatter on the wall and the ceiling of the food prep area. Several knifes were found, including a butcher knife with apparent blood on it found in the trashcan. Although the knives were tested for fingerprints, no prints of value were retrieved. A metal tray was also recovered that had what appeared to be knife punctures on it. An apron and baseball cap with apparent blood was also found.

Duarte died as a result of the attack, sustaining twenty-nine stab wounds to his face, head, neck, chest, scrotum, arms, and legs. No one saw Duarte with a weapon nor was one found on his body. Many of the witnesses testified at trial that they had not heard any arguments before the stabbing nor had they observed previous arguments between the two men. Each of the witnesses identified Reyes as the person who committed the crime.

Reyes was arrested on a warrant in Sanford, Florida, in August 1999, over a year after the incident. His photograph was taken and placed in a photo line-up. Again, each witness identified Reyes.

A jury found Reyes guilty of second-degree murder and armed criminal action. In accordance with the jury's recommendation he was sentenced to life sentences, to run concurrently. This appeal follows.

## I.

In his first point on appeal, Reyes claims that the trial court abused its discretion in permitting the State to argue its case in *voir dire*. He asserts that the purpose of *voir dire* is to discover bias, but the State's examination presented evidence to the venire members in a way that created bias against Reyes and in favor of a guilty verdict before any evidence had been admitted at trial. He claims that the questions posed by the prosecutor were also argumentative, phrased in a manner which preconditioned the venire members to react, even subconsciously, in a particular way to evidence the prosecutor anticipated producing at trial.

The prosecuting attorney in this case stated the following:

I need to tell you a sentence or two about what the State alleges in this case. It is by no means the evidence in this case, but just an introduction into what you might hear in this case so that I can ask you whether or not anybody knows anything about this case.

I will tell that you [sic] the State alleges that on July 17th, 1998, at the Louisiana Jazz Restaurant this defendant was working as a dishwasher and he was in the same vicinity as Mr. Marco Duarte, the victim in this case.

The State alleges that this defendant took a butcher knife, some 15 inches in length . . .

Defense counsel then objected to the statement concerning the length of the knife, claiming that the State was describing in grand detail and arguing the case. The trial court overruled the objection, stating

that the court believed that the State was "trying to identify if they've read about it[.]" The State continued:

The State alleges that the defendant took a butcher knife some 15 inches in length and repeatedly, repeatedly stabbed Mr. Duarte something like between 25 to 30 wounds, to the point that he died.

Having heard just the brief set of the allegations in this case is there anybody that would say, ". . . based on what you've told me, I think I may know something about this case; I read about it or I saw it on some news media, some friend told me about it."

▇▇▇▇ "The control of *voir dire* is a matter within the sound discretion of the trial court." *State v. Dudley*, 51 S.W.3d 44, 54 (Mo.App.2001). Under both the Missouri and United States Constitutions, a defendant is entitled to a fair and impartial jury. *State v. Clark*, 981 S.W.2d 143, 146 (Mo. banc 1998). Along with this right is the ability to adequately *voir dire* the jurors to identify unqualified jurors. *Id.* "The purpose of *voir dire* is to discover bias or prejudice in order to select a fair and impartial jury." *Id.* To protect a defendant's right to an impartial jury, "the Court and the parties must determine a prospective juror's personal knowledge of the crime or his exposure to pretrial publicity." *State v. Antwine*, 743 S.W.2d 51, 58 (Mo. banc 1987). To make this determination, counsel must reveal "some portion of the facts of a case on *voir dire* [.]" *Id.* Counsel, however, is not permitted "to try the case on *voir dire* by a presentation of the facts in explicit detail." *Id.* "Nor is *voir dire* an appropriate occasion for argument." *Id.* "The trial judge is in the best position to determine whether a disclosure of facts on *voir dire* is sufficient to assure the defendant of an impartial jury without, at the same time, being tantamount to a

presentation of evidence." *Id.* at 58. This court "will find reversible error only where an abuse of discretion is found and the defendant can demonstrate prejudice." *State v. Oates,* 12 S.W.3d 307, 311 (Mo. banc 2000).

■ Reyes asserts error concerning two facts mentioned by the State that, he claims, led the jury to think that the nature of the conduct was outrageous and unacceptable and sought to turn their minds toward conviction before any evidence was presented. Those facts are that defendant took "a butcher knife some 15 inches in length" and "repeatedly, repeatedly stabbed Mr. Duarte something like between 25 and 30 wounds, to the point he died." While defense counsel objected to the statement concerning the length of the knife, he did not object to the statement concerning the repeated stabbing or number of wounds. Thus, review of the second comment could only be for plain error. *State v. Johnson,* 968 S.W.2d 123, 127 (Mo. banc 1998).

In *State v. Wells,* 33 S.W.3d 210, 212 (Mo.App.2000), the Southern District of this court addressed a similar argument by the defendant. There, the defendant claimed that "the trial court plainly erred when in *voir dire* the prosecutor was allowed to argue to the jury that the 'evidence would show that [Appellant] had been using marijuana and alcohol and had swerved into the wrong lane....'" *Id.* "This, Wells claimed, predisposed the jury to convict him before it had heard any evidence." *Id.* The statement made by the prosecution in *Wells* was as follows:

> This case is a criminal case as the judge indicated to you. On the 31st of May, 1997[,] in the early afternoon, two men named Larry Matjcek and Mark McGraw were driving an automobile on Highway 19 between Cuba and Steelville. Highway 19 is a primary road between Cuba and Steelville and the distance between the two is about 8 miles. In fact, Highway 19 continues on into Salem right through town here. They were driving from Steelville to Cuba going South in a Chevrolet Lumina. The defendant, at about the same time was driving north on Highway 19 in a pick-up truck. The defendant, the evidence will show, had been using alcohol and marijuana and swerved into the lane occupied by the two men in the Lumina and a crash occurred and those men were seriously injured. Has anyone here heard anything about this incident or read anything in the paper or know anyone involved or just heard about it from friends? Anyone at all? [emphasis omitted].

*Id.* The court in *Wells* determined that the "State had a legitimate purpose in setting out specific facts of the case in order to determine whether anyone had prior knowledge of the case[,]" and found "nothing argumentative or prejudicial about the context in which the State's recitation of facts was made." *Id.* at 213.

Reyes cites *State v. Lacy,* 851 S.W.2d 623, 629 (Mo.App.1993), in arguing that the "phrasing of the *voir dire* questions in a manner which preconditions the jurors' minds to react even subconsciously in a particular way to anticipated evidence" is improper. He is correct. The facts of this case, however, are distinguishable from *Lacy* and other cases where courts have affirmed a trial court's sustaining of certain questions.

In *Lacy,* defense counsel attempted to ask, "Now, I'm going to ask you the question that if you heard evidence from the State that [the defendant] told the police officer in a tape recorded statement—" and the State objected. *Lacy,* 851 S.W.2d at 628. At a side bar, defense counsel

stated to the court that he was attempting to see if they would follow the instructions:

> [DEFENSE COUNSEL:] If the Court instructs you that a statement was made by the Defendant would you be able to under all the circumstances surrounding and attending the making of the statement decide whether it was freely and voluntarily made under all of the circumstances, and that is specifically from the instruction, and I would ask them if they have any opinions or deep beliefs that would prevent them from following the Court's instruction?
>
> I would ask them if they also would be able to if the Court instructed them that when considering such a statement whether the Defendant understood what he was saying and doing and if the Court instructed them in that fashion would they be able to follow the Court's instructions and would they have any opinions or beliefs that wouldn't allow—prevent them from following the instructions of the Court?
>
> [PROSECUTOR:] Judge, I don't believe the law is that during *voir dire* counsel can tell the Jury what he anticipates what the instructions say, because if that were the law then counsel—both could get up there and just say "I anticipate that the Court will instruct you that", and I can read Instruction 4 about the presumption of innocence. I could read Instruction 2. I think this is—
>
> THE COURT: I'm going to sustain your objection. You may ask the Jury whether or not they can follow the Court's instructions, but I think we'll get into an area of argument and therefore I'm not going to allow it.

*Id.* The court in *Lacy* determined that the trial court had not abused its discretion since the court and the prosecution had been allowed to ask if anyone could not follow the law and the instructions, to which there was no response. *Id.* at 629. It noted that the trial court "viewed defense counsel's proffered question as getting into an area of argument, ... but did allow defense counsel to inquire whether the venirepersons could follow the court's instructions." *Id.*

Likewise, in *State v. Womack,* 967 S.W.2d 300, 302 (Mo.App.1998), this court affirmed the decision of the trial court prohibiting defense counsel from asking a question concerning eyewitness testimony:

> Defense counsel asked the panel if "[t]here is anyone who thinks an eyewitness can never be mistaken?" There was no response. He then asked, "[i]s there anyone who thinks an eyewitness is unlikely to make a mistake?" A discussion ensued with a venireman who indicated that misidentification was a possibility. He then asked if there was anyone that agreed with that venireman. The state objected and the trial court sustained the objection.

This court found that the question was not intended to uncover bias or prejudice, but was argumentative, intending to "inject the defendant's argument, that the eyewitness was not reliable, into the voir dire examination." Id.

█ Here, as in *Wells,* the context in which the statements were made were not sufficiently argumentative or prejudicial to warrant reversal. The State was presenting sufficient facts to ensure that the prospective jurors had no prior knowledge of the case. This case did not proceed to trial until almost two and one-half years after the crime occurred, partly due to Reyes fleeing to Florida and not being apprehended until a year after the incident. Here, unlike *Lacy* and *Wells,* a brief and general statement of the facts was recited to determine prospective jurors' prior knowledge of the case. Facts were not used in a specific question that re-

quired comment on a specific aspect of the case, nor did the questions tend "to commit the prospective juror to a course of action" or to "speculate what his reaction might be in such manner that he might not feel free to react otherwise." *State v. Abbott*, 654 S.W.2d 260, 275 (Mo.App.1983). While this court recognizes that questions can have dual purposes, the decision of the trial court in this case does not present "manifest abuse or a real probability of injury." *Lacy*, 851 S.W.2d at 629.

Reyes argues that the statement of venireperson Daryl Smith shows that the prosecution "sought to turn [venire members'] minds toward a conviction before any evidence was even presented." Outside the presence of the panel, venireperson Smith told the court and counsel of a preconceived bias toward the prosecution:

> I think I hold a bias in favor of the prosecution that it might be fair to advise everyone of.
>
> I had an uncle when I was a boy who was a lieutenant. . . . He was a role model, and that probably influenced my opinion of police activity. . . .
>
> As I think about other things that have occurred . . . I think I'd have a tendency, a bias here to be in favor of what the prosecution is pursuing, and it's only fair to advise the defense of that.
>
> . . . .
>
> By the same token, in my mind, it's only fair to tell you if someone is stabbed 25 to 30 times and that's proved by the State, I'm hard-pressed to not conclude this is a situation in which he is guilty.

Smith's statements do not necessarily show that reversal is warranted. Clearly, Smith had a preconceived bias to the prosecution and was removed for cause. While the statement concerning the number of stabs may have given him further reason to be biased, it certainly did not cause his bias. It is unlikely that the number of stab wounds had a decisive effect on the panel, considering the number of eye witnesses, Reyes' fleeing and the overwhelming evidence of his guilt. Further, it seems paradoxical that Reyes would complain about a bias that was uncovered that would have been detrimental to him. Defense counsel failed to object to the statement concerning the number of wounds and this court cannot say that manifest injustice or a miscarriage of justice occurred when this statement was made by the State. Rule 30.20. Likewise, the trial court did not abuse its discretion in overruling Reyes' objection concerning the statement of the length of the blade. Point I is denied.

## II.

In his second point, Reyes claims that the trial court abused its discretion in permitting the prosecutor, during closing argument, to denigrate defense counsel in that the prosecutor speculated on what defense counsel might have argued if the evidence was different, ignored the argument defense counsel did make based on the evidence, and personally attacked legal counsel rather than any issue properly before the jurors.

"Trial courts have wide discretion in controlling closing arguments, but they abuse that discretion when they allow plainly unwarranted and injurious arguments." *State v. Hahn*, 37 S.W.3d 344, 356 (Mo.App.2000). Where a trial court has abused its discretion with respect to improper closing arguments, reversal is warranted only upon showing that the defendant was prejudiced. *State v. Williams*, 24 S.W.3d 101, 124 (Mo.App. 2000). Prejudice is established by showing "that there is a reasonable probability that, in the absence of the trial court's abuse, the verdict would have been different." *Id.*

At the end of closing arguments, assistant prosecuting attorney Michael Rader stated the following:

> Ladies and gentlemen, before I sit down and allow [defense counsel] a chance to speak on behalf of the defense, I'd like to remind of you [sic] a quote Harry S. Truman used, very applicable today. "If you can't convince them, confuse them." That's exactly what he's going to try to do. They don't have a defense—

Defense counsel objected to this statement arguing that it was a personal attack. The trial court sustained the objection and instructed the jury to disregard the last comment.

During defense counsel's closing argument, counsel attempted to raise doubt concerning the evidence that was and was not presented. He argued that Thompson did not actually see Reyes stab Duarte; that the testimony from certain relatives of Duarte who were present was not heard; that no evidence concerning fingerprints, DNA, or other physical evidence tying Reyes to the crime was presented; and that some of the testimony from the witnesses was inconsistent.

In rebuttal argument, assistant prosecuting attorney Tim Dollar began by stating:

> You see what Mr. Rader was talking about; right? It's sort of a noble effort, and the defense, as is his duty and his obligation, and I respect that and understand that, is to ask as many questions that can never be answered, because every case involves issues that are outside the purview of witnesses who testify in the case.

No objection was made to this statement. Later, the prosecuting attorney stated:

> He says, well, they didn't see each other and he raises some issues about they didn't see this or they didn't see that. I always find that interesting. You know,

if each of the witnesses came in and testified like robots and there was not a single, deviation [defense counsel] would be saying "isn't that odd? Looks like they were coached."

Defense counsel objected, stating again that it was a personal attack on opposing counsel. Further he stated, "How would he know how I would respond?" This objection was denied. The prosecuting attorney continued, "Can you imagine? That's exactly what he'd be saying."

Reyes argues that "[b]oth prosecutors ... engaged in a purposeful, intentional, and flagrant plan to make defense counsel as much a part of the case as the evidence produced at trial. Denigration of defense counsel's representation ... was a conscious and repetitious theme of the prosecutors' closing arguments." While Reyes, citing several cases, argues that the cumulative and egregious nature of the errors may be grounds for reversal where the errors by themselves would not be cause for reversal, this court does not believe reversal is warranted in this case.

 Defense counsel objected to the first statement made by the prosecution. The trial court sustained the objection and instructed the jury to disregard the statement. Having failed to request any additional relief, he cannot now complain that the trial court erred with respect to this statement by the prosecution. *State v. Scurlock*, 998 S.W.2d 578, 586 (Mo.App.1999). Further, he failed to object to the second statement to which he asserts error; at most, this court may review for plain error. *State v. O'Haver*, 33 S.W.3d 555, 561 (Mo.App.2000). Statements made during closing arguments rarely result in reversal based upon plain error review. *Id.* Only with respect to the third statement did defense counsel object

and was overruled. There, the State argued:

> He says, well, they didn't see each other and he raises some issue about they didn't see this or they didn't see that. I always find that interesting. You know, if each of the witnesses came in and testified like robots and there was not a single, deviation [defense counsel] would be saying "isn't that odd? Looks like they were coached."

Reyes is correct that personal attacks on defense counsel by the prosecutor are "improper and objectionable." *Id.* at 563. Such statements, however, do not always require reversal. *Id.* And, where statements are "directed at the tactics or techniques of trial counsel rather than counsel's integrity or character[,]" the argument is permissible. *Id.*

In *State v. Crews,* 923 S.W.2d 477, 482 (Mo.App.1996), the Southern District compared instances in which courts have reversed convictions based upon improper statements made by prosecutors and instances where courts have found that the comments attacked the methods or theory of defense counsel and did not rise to the level of "prosecutorial impropriety" warranting reversal. First, the court addressed the cases of *State v. Greene,* 820 S.W.2d 345 (Mo.App.1991) and *State v. Hornbeck,* 702 S.W.2d 90 (Mo.App.1985) where reversals were warranted:

> In *Hornbeck,* the court reversed the conviction of a defendant where the trial court had allowed the prosecutor over objections to accuse defense counsel of conspiring to prevent a witness' testimony; in other words the prosecutor accused defense counsel of conspiring to commit a crime. In *Greene,* the prose-

cuting attorney strongly implied that the defense counsel was lying to the jury. Although the trial judge sustained defendant counsel's objections, the trial court refused to instruct the jury to disregard the prosecutor's statement. This Court said that "[s]tatements, without basis in the record, that defendant's counsel acted improperly, are error, as they degrade the defense." [citation omitted].

*Crews,* 923 S.W.2d at 482. The court in *Crews* contrasted these cases with *State v. Ward,* 807 S.W.2d 225, 226 (Mo.App.1991) and *State v. Petary,* 781 S.W.2d 534, 541 (Mo. banc 1989).[4]

> In [*Ward*], the prosecutor's comments that defense counsel was resorting to trickery were not improper because the comments were merely an attack on defense counsel's methods, rather than an attack on defense counsel's character and integrity. Further, in [*Petary*] ... prosecutorial comments that defense counsel told the jury a "story" and that the jury would have to be a "magician" to believe defense counsel were considered proper because the comments merely suggested that the defense theory was not supported by the evidence and thus did not constitute an improper attack on the integrity of defense counsel.

*Crews,* 923 S.W.2d at 482. In *Crews,* the prosecutor remarked that "defense counsel acted like a 'magician' in distracting the jury from the facts and that the defense counsel portrayed his clients as 'victims[.]'" *Id.* In light of the four cases addressed above, the court determined that the comments concerned defense counsel's tactics or methods and did not

---

4. As the court in *Crews* noted, *Petary* was vacated and remanded on other grounds by the United States Supreme Court and subsequently affirmed by the Missouri Supreme Court. The holdings cited by the court in *Crews,* however, "remained intact in those decisions." *Crews,* 923 S.W.2d at 482 n. 3.

require reversal based upon plain error review. *Id.*

 Here, as in *Crews,* the prosecuting attorney's statement was directed more toward the tactics of defense counsel than to attack his character and integrity. The statement addressed the strategy of defense counsel to question the veracity of the witnesses because, according to defense counsel's closing argument, they contained inconsistencies, and suggested what the strategy might have been if the testimony would have been different. *See State v. Castillo,* 853 S.W.2d 381, 386 (Mo. App.1993) (holding that prosecution's closing remarks were not clearly unwarranted since they were made in retaliation to defense counsel's attack on the credibility of the State's witnesses; and by attacking the credibility of the State's witnesses, defense counsel invited a response from the State). While the comments made by the prosecution in this case were somewhat more tenuous than a direct retaliation to defense counsel's attack on the credibility of witnesses, the essence of the statement is the same.

Even if this court were to find that the statements were improper, Reyes must still show that he was somehow prejudiced by these remarks. In this respect, Reyes states that all of the witnesses who testified were called by the State and that "all of the occurrence witnesses identified" him as the perpetrator. He further argues the following:

> The only opportunity Mr. Reyes had to defend himself at trial was to argue the inconsistencies in the evidence, the lack of proof from laboratory testing, and the failure of the State to conduct other tests. His defense was to show reasonable doubt of his guilt from the inconsistencies and unanswered questions. This defense necessarily relied upon closing argument by defense counsel to explain

the theory and persuade the jurors of its validity. And so the prosecutors chose not only to argue their evidence in favor of guilt, but to personally attack and denigrate defense counsel.

This argument does not show that Reyes was adequately prejudiced to warrant reversal. Reyes was not deprived of his ability to make these arguments during closing arguments. Each of the statements by the prosecution was made either in anticipation of or response to the arguments made by defense counsel in closing arguments. Just as Reyes was allowed to question the evidence in this case, the State, too, is allowed to question the defense's theory and attack the credibility of witnesses or evidence. *See Castillo,* 853 S.W.2d. at 386. Point II is denied.

The judgment is affirmed.

SMART and EDWIN H. SMITH, JJ., concur.